PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 08-4730

D.S., individually and as Guardian ad litem of D.S.,
A.S., individually and as Guardian ad litem of D.S.,

Appellants

v.

BAYONNE BOARD OF EDUCATION,

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 2:08-CV-01726)
Honorable William J. Martini, District Judge

Submitted March 9, 2010

BEFORE: MCKEE, BARRY, and
GREENBERG, Circuit Judges

Filed:  April 22, 2010

Lori M. Gaines
Staci J. Greenwald
Sussan & Greenwald
1249 South River Road
Suite 104
Cranbury, NJ 08512

    Attorneys for Appellants

James L. Plosia, Jr.
Apruzzese, McDermott, Mastro & Murphy, P.C.
25 Independence Boulevard
P.O. Box 112
Liberty Corner, NJ 07938

    Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge

## I. INTRODUCTION

This matter comes on before this Court on an appeal from an order of the District Court, entered on November 19, 2008, terminating the obligation of Appellee Bayonne Board

2

of Education ("Bayonne") to pay the tuition of Appellants' son D.S. at the Banyan School, a private school for learning disabled children in Little Falls, New Jersey, and denying Appellants' motion for attorney's fees, costs, and interest. The District Court's order reversed a decision of a New Jersey administrative law judge ("ALJ") who held Bayonne liable for the cost of D.S.'s tuition at the Banyan School. The ALJ ordered relief because of her conclusions that Bayonne had failed to provide D.S. with a free and appropriate public education during the 2006-2007 school year in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and that D.S.'s placement at the Banyan School would satisfy the IDEA. The District Court adjudicated the case on the record compiled before the ALJ but reached a conclusion opposite of that of the ALJ as the Court believed that Bayonne had provided D.S. with a free and appropriate public education. For the reasons that follow, we will reverse the order of the District Court and will reinstate the decision of the ALJ. We will provide, however, that the Court on remand determine the details of the relief to be granted to Appellants.

## II. BACKGROUND

Before setting forth a detailed analysis of the proceedings and evidence and addressing Appellants' claims on the merits, we will outline the framework of the IDEA pursuant to which states provide education to children with disabilities.

3

A.     Statutory Framework

The IDEA requires that states to receive federal education funding make available a free and appropriate public education to all children with disabilities residing within their borders. 20 U.S.C. § 1412(a)(1). In particular the IDEA specifies that the education the states provide to these children "specially [be] designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." Bd. of Educ. v. Rowley, 458 U.S. 176, 188-89, 102 S.Ct. 3034, 3042 (1982) (internal quotation marks omitted). Although a state is not required to supply an education to a handicapped child that maximizes the child's potential, it must confer an education providing "significant learning" and "meaningful benefit" to the child. Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999). Thus, "the provision of merely more than a trivial educational benefit" is insufficient. L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006) (quoting T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 3d Cir. (2000) (internal quotation marks omitted)). In addition to establishing educational standards, the IDEA includes a "mainstreaming" component requiring the placement of a student with disabilities in the least restrictive environment that will provide the child with a meaningful educational benefit. Id.

The IDEA contemplates that school districts will achieve these goals by designing and administering a program of individualized instruction for each special education student set forth in an Individualized Education Plan ("IEP"). 20 U.S.C. §§ 1412(a)(4), 1414(d). The IEP is so significant

4

that the courts have characterized it as the "centerpiece" of the IDEA's system for delivering education to disabled children. Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 173 (3d Cir. 1988) (quoting Honig v. Doe, 484 U.S. 305, 311, 108 S.Ct. 592, 598 (1988)). "An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 589 (3d Cir. 2000) (citing 20 U.S.C. § 1401(a)(20)). A team consisting of the student's parents and teachers, a curriculum specialist from the local school district, and, if requested, a person with special knowledge or expertise regarding the student must develop an IEP. 20 U.S.C. § 1414(d)(1)(B). The IEP team will review the IEP at least annually to determine whether the stated goals for the student are being achieved. 20 U.S.C. § 1414(d)(4). When appropriate the team will revise the IEP to address, among other things, lack of progress, necessary changes arising from reevaluation of the child, and parental input. 20 U.S.C. § 1414(d)(4).[1]

Though the IEP must provide the student with a "basic floor of opportunity," it need not necessarily provide "the optimal level of services" that parents might desire for their

_____

[1]State and federal regulations detail the method for implementing the IDEA's requirements. S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 264 (3d Cir. 2003). New Jersey's requirements for developing an IEP follow the federal requirements. Id. (internal citations omitted).

5

child. See Holmes, 205 F.3d at 590 (quoting Carlisle Area Sch. v. Scott P., 62 F.3d 520, 533-34 (3d Cir. 1995)). Nevertheless, "at a minimum, '[t]he IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'" Chambers v. Philadelphia Bd. of Educ., 587 F.3d 176, 182 (3d Cir. 2009) (quoting Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004)). When a state is unable to provide a free and appropriate public education to a child but a private school can provide that education, the state must reimburse the child's parents for the private school costs. Ramsey Bd. of Educ., 435 F.3d at 389-90 (citing Kingwood Twp. Bd. of Educ., 205 F.3d at 577).

If parents believe that an IEP fails to provide their child with a free and appropriate public education, they may challenge the IEP in an administrative proceeding. 20 U.S.C. § 1415(b)(6). But in the apparent interest of minimizing the stress and expense of an adjudicatory administrative proceeding, New Jersey requires parents and a school board disputing the adequacy of an IEP initially to mediate their dispute. Then, if mediation is unsuccessful, there will be a "due process hearing" held before an ALJ to seek a resolution of their dispute. Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 198. At an administrative hearing challenging an IEP, the party seeking relief bears the burden of proof.[2] Ramsey

---

[2]After Appellants initiated the administrative proceedings in this case, New Jersey enacted legislation placing the burdens of proof and production on school districts in due process hearings under the IDEA. N.J. Stat. Ann. § 18A:46-1.1 (West 2009).

6

<u>Bd. of Educ.</u>, 435 F.3d at 392 (citing <u>Schaffer v. Weast</u>, 546 U.S. 49, 62, 126 S.Ct. 528, 537 (2005)).  A party to the due process hearing aggrieved by its outcome has the right to bring a civil action challenging the decision in any state court of competent jurisdiction or in a federal district court, without regard to the amount in controversy.  20 U.S.C. § 1415(i)(2).

B.     Factual Background

When D.S. was six years old, he began to suffer from epileptic seizures attributable to brain tumors.  The treatment for the seizures included the use of large quantities of anti-epileptic medicine.  Unfortunately D.S.'s condition and treatment combined to place severe limits on his cognitive abilities as demonstrated by the circumstance that he had a full scale IQ within the mentally retarded range.  D.S. began attending Bayonne public schools in the second grade.  After D.S. repeated the second grade, Bayonne classified him as "other health impaired" and provided him with a special education program in the third grade during the 2000-2001 school year.  D.S. underwent brain surgery in 2001 and 2003, in which the tumors were removed successfully.  D.S.'s seizures abated completely following the 2003 operation allowing him to cease taking preventive medication.  As a

This legislation, however, has no bearing in this case, as it applies only to due process hearings requested after January 13, 2008, the effective date of the act.  <u>See</u> <u>id.</u>, historical and statutory notes.

result, although he still suffered from significant learning difficulties, his condition improved. Thereafter D.S. remained a student in the Bayonne schools into the ninth grade during the 2006-2007 school year. At that level the Bayonne schools placed D.S. in the school's self-contained "cluster" program in which special education teachers educate special education students in a classroom environment distinct from that of the general student population.

1. Report of Neuropsychologist Maria DiDonato

Notwithstanding D.S.'s placement in the cluster program, Appellants obviously were dissatisfied with D.S.'s progress in the Bayonne schools for they retained the services of several professionals to evaluate D.S. for a better understanding of his educational needs and abilities. Thus in April and May of 2006, they retained a neuropsychologist, Dr. Maria DiDonato, to administer a series of aptitude and achievement tests to D.S. while he was in the eighth grade. Based on an evaluation of D.S.'s cognitive reasoning skills using the Wechsler Intelligence Scale for Children IV ("WISC IV"), DiDonato determined that D.S. had a full-scale IQ score of 81, within the low average range of intellectual functioning, signaling that his intellectual capacity had improved following the surgeries. Nevertheless, D.S. evidenced below grade level achievement and in the Wechsler Individual Achievement Test II ("WIAT") scored at the 6.6 grade level for basic reading skills, the 4.2 grade level for reading comprehension, the 7.2 grade level for numerical

operations, the 5.4 grade level for math reasoning, the 5.5 grade level for spelling, and the 6.2 grade level for written expression.

DiDonato also administered the Standard Reading Inventory-Second Edition test to D.S. which yielded results indicating that his reading comprehension skills were at the third-grade level and showed that he experienced fourth-grade level frustration when reading. In addition, DiDonato determined, based on answers that D.S. and his parents supplied in response to a behavioral health questionnaire, that D.S.'s emotional health reflected clinically significant signs of withdrawal, problems with attitude towards his school and teachers, and internalization of problems causing feelings of depression and inadequacy.

Predicated on these evaluations, DiDonato recommended, inter alia, moving D.S. away from distracting stimuli during instruction, providing written instructions verbally as well as on the blackboard, using repetition and overlearning of novel information, rephrasing or representing information in different words when there is evidence that D.S. might not understand what is being asked or presented, using multi-sensory instruction whenever possible, breaking assignments into shorter tasks, teaching encoding strategies such as mnemonics and "chunking," allowing extra time for tests, and, when possible, giving tests orally.

2.    Report of Speech-Language Pathologist Inna Levine

9

DiDonato referred D.S to a speech-language pathologist, Inna Levine of the Robert Wood Johnson University Hospital. Levine examined D.S. in June of 2006, administering a series of tests to determine his strengths and weaknesses in a variety of linguistic tasks. The results of these tests led Levine to conclude that although D.S. displayed strengths in a number of areas—including comprehension of direct commands, practical verbal reasoning, problem solving, sentence comprehension, and spelling—he had significant problems understanding oral communications consisting of more than a sentence or two. Levine found that D.S. struggled in that function to such an extent that he was unable to process and retain any information presented in a short one-paragraph narrative of fourth or fifth grade level material. Levine also noted that D.S. struggled to express himself both orally and in writing due to immature organization, immature vocabulary, and insufficient specificity.

Based on her observations, Levine recommended that D.S.'s school provide him with individual pull-out speech therapy three times a week to focus on auditory comprehension, memory, and word finding, and additional speech therapy two times a week in a small group setting to focus on developing conversation skills and building vocabulary. Levine also recommended that these speech therapy sessions address various "life skills" to help prepare D.S. for post-school career planning. But inasmuch as Levine did not analyze D.S.'s reading comprehension ability, she recommended that he meet with a reading specialist to determine the optimal complexity of the instructional material used in D.S.'s education.

### 3. Report of Audiologist Lorraine Sgarlato-Inducci

Several months later on October 9, 2006, after D.S. had begun his ninth grade year at Bayonne High School, his parents took him to audiologist Dr. Lorraine Sgarlato-Inducci, who like Levine, was from the Robert Wood Johnson University Hospital, for a central auditory processing assessment. Sgarlato-Inducci concluded that D.S. displayed a severe deficit in central auditory processing skills, with specific deficits in the areas of auditory decoding, auditory memory, phonemic conceptualization, and binaural separation. Thus, she concluded that D.S. had significant difficulties processing and retaining verbal information. Not surprisingly, these difficulties were magnified both by the presence of auditory distractions and an increase in the length of the verbal information to be processed. Sgarlato-Inducci recommended, inter alia, that the school provide D.S. with intensive speech therapy, small group language-based instruction on an ongoing basis, and instruction using a multi-sensory educational and remedial approach.[3] She also recommended that the teachers provide information to D.S. in small, easily decipherable "chunks" to facilitate comprehension, storage, and recall, and that the teachers seat him away from possible distractions. Moreover, she

---

[3]In particular, Sgarlato-Inducci recommended that the school provide D.S. with intensive remediation instruction in reading, writing, comprehension, and spelling using a research-driven multisensory program such as the Lindamood-Bell, Wilson, or Orton-Gillingham programs.

11

recommended that the teachers test him in an untimed and quiet environment, repeat and rephrase information as needed, and use an FM desk-top amplification system to help D.S. hear their voices over ambient noise in the classroom.

#### 4. The 2006-2007 IEP

In letters they sent on June 8, July 13, September 6, and October 30, 2006, Appellants shared the evaluations they had obtained from DiDonato, Levine, and Sgarlato-Inducci with Bayonne and requested to meet with a child study team from Bayonne High School to incorporate the findings and recommendations from those evaluations into D.S.'s ninth grade IEP. Although Bayonne initially did not respond to Appellants' letters, eventually there was an IEP meeting to consider D.S.'s case in November 2006. Appellants, D.S.'s teachers, his case manager Sharon Peraino, and DiDonato attended that meeting. In the letters preceding the IEP meeting and at the meeting itself, Appellants expressed concern that D.S. was not making sufficient academic progress in the Bayonne public school system.

An updated IEP was issued on November 29, 2006, summarizing the reports of DiDonato, Levine, and Sgarlato-Inducci, and D.S.'s teachers' comments for the 2006-2007 school year. By and large, D.S.'s teachers indicated that D.S. was a polite, pleasant, and hard-working student, albeit somewhat shy, and that he was meeting academic expectations, even though he at times struggled in certain areas. D.S.'s English and language arts teachers noted that he

12

had difficulties with vocabulary, grammar, comprehension, and recall. D.S.'s pre-algebra teacher noted that he struggled when taking tests, becoming nervous and anxious, but that if given the same assignment without calling it a "test" he would achieve a grade of 90% or above.

For each area of D.S.'s instruction, the IEP recommended the following modifications and accommodations:

> Tests/exams may be taken in the special education classroom with extended time
> Homework assignments may be modified as needed
> Classwork may be modified as needed
> Criteria for grading may be modified
> Extra set of textbooks may be kept at home
> Tests/exams may be reformatted
> Tests may be administered orally
> Directions may be repeated/rephrased/clarified
> Break down tasks into manageable units
> Provide student with preferential seating
> Provide student with study guides
> Highlight key words
> . . . .
> Provide a highly structured environment
> Use drill and repetitive practice
> Use multi-sensory approach
> Use manipulative[4]

---

[4]"Use manipulative" appears in that form in the original.

13

App. at 121-32. Appellants, however, refused to sign the updated IEP because they believed that it failed to address D.S.'s educational needs. Nevertheless, because they did not submit any additional proposals to modify the IEP, and did not seek to challenge the IEP through mediation or at a due process hearing, the IEP became effective 15 days after Appellants had received it. See N.J. Admin. Code § 6A:14-2.3(h) (2010).

### 5. Dr. DiDonato's Classroom Observation

Appellants continued to consult outside evaluators throughout the 2006-2007 school year. At their request and with Bayonne's permission, DiDonato observed D.S. at Bayonne High School on January 5, 2007, from approximately 9:20 A.M. until 1:30 P.M., for the purpose of evaluating his educational program. In particular she observed classes in mathematics, general science, English, introduction to technology, world history, gym, and lunch. Based on her observations, DiDonato issued a report reflecting her conclusions that the educational program Bayonne High School was supplying D.S. was inappropriate for his specific learning needs. According to DiDonato, in most of the classes she observed, D.S. struggled to process information quickly enough to keep up with the pace of instruction. She also noted that D.S. seemed to be experiencing difficulty interacting socially with other students.

14

Although in some instances DiDonato criticized D.S.'s teachers for failing to comply with the IEP—such as by not providing a quiet environment for test-taking—she placed greater blame on the IEP itself, concluding that "[t]he goals and objectives in the IEP and the current instructional program being implemented do not adequately address the needs that have been identified." App. at 155. Ultimately, DiDonato concluded that D.S. required "placement within a small, highly structured school for students with learning disabilities" as only such a school would be able to address D.S.'s academic and social needs. Id. at 157. On March 19, 2007, after they received DiDonato's report, Appellants commenced the administrative proceedings underlying this appeal by filing a petition for a due process hearing with the New Jersey Department of Education Office of Special Education seeking an order directing Bayonne to pay for an out-of-district placement for D.S. at the Banyan School.

6.      Expert Report of Dr. Brooks

After they initiated the administrative proceedings, Appellants sought and obtained a report on D.S.'s case from Dr. Jill Brooks, a licensed speech and language pathologist and clinical neuropsychologist. Brooks interviewed Appellants and reviewed D.S.'s medical and educational record from 1997, when D.S.'s tumors first were diagnosed, until 2007, including the 2006 IEP and DiDonato's in-class observation reports. Based on this review, Brooks concurred with the evaluations and recommendations that other professionals who had met with D.S. had made, and

15

emphasized the need for a structured, intensive reading program—such as the Lindamood-Bell, Wilson, or Orton-Gillingham programs—and recommended that D.S. participate in a social skills group for training in social skills and pragmatic language. In her analysis of the education that Bayonne was providing to D.S., Brooks was "struck by the minimal services offered to [D.S.] throughout his academic career," and concluded that Bayonne had "not taken the responsibility of evaluating or remediating" any of D.S.'s academic and behavioral problems. App. at 177.

### 7. Hackler and Wilkinson Evaluations

Though Appellants had obtained numerous evaluations of D.S., the evaluation process was not one-sided for in May 2007 Bayonne designated learning consultant Lucy Hackley and school psychologist Mary Beth Wilkinson to evaluate D.S. to determine his cognitive level. Hackler administered Woodcock-Johnson III ("Woodcock-Johnson") achievement tests to gauge D.S.'s grade-level proficiency in several academic areas. In these tests D.S. scored at the 3.8 grade level for reading comprehension, the 6.8 grade level for math calculation, the 5.3 grade level for math reasoning, the 5.7 grade level for basic writing skills, and the 5.8 grade level for written expression. In each of these subject areas in terms of grade-level equivalence D.S. scored lower than he had scored approximately one year earlier when he took the WIAT achievement test that DiDonato administered. Wilkinson's psychological evaluation consisted of an IQ test and a Multidimensional Self Concept Scale exam, which assessed

social-emotional adjustment. D.S's IQ was assessed using the WISC-IV test at 78, within the borderline range of intellectual functioning. When D.S. had taken this test approximately one year earlier, the result was a slightly higher IQ score of 81, within the low average range of intellectual functioning. On the Multidimensional Self Concept Scale exam, D.S. received a total score of 70, indicating that he had a very negative self-image.

8.      D.S.'s Final Grades for the 2006-2007 School Year

At the completion of the 2006-2007 school year, D.S. received a cumulative final grade point average of 92 for his major subjects. He received scores of 95 in general sciences, 95 in English, 93 in language arts, 87 in math, and 90 in world history. His overall cumulative grade point average in major subjects for the 2006-2007 school year increased over his previous averages for in each of the previous four years D.S. had received an average in the mid to high 80s.

C.      Procedural History

1.      State Administrative Proceedings

17

In early 2007, while D.S. was in ninth grade, Appellants concluded that Bayonne was failing to provide D.S. with a free and appropriate public education, a conclusion leading them on March 19, 2007, as we already have indicated, to file their petition for a due process hearing challenging Bayonne's education treatment of D.S. The Department of Education transmitted the case to the New Jersey Office of Administrative Law which assigned an ALJ to the case who conducted the hearing over a period of months in 2007.

At the hearing, the ALJ reviewed the reports that the parties had compiled and heard testimony from D.S.'s father as well as from a number of educators and health professionals who had worked with or evaluated D.S. There was substantial focus at the hearing on determining the significance of D.S.'s high final grades for the 2006-2007 school year in light of the decrease in grade-level proficiency when his 2007 scores on the Woodcock-Johnson tests were compared to his 2006 scores on the WIAT tests. It is clear that Bayonne's witnesses, in particular D.S.'s teachers and his case manager Peraino, believed that D.S.'s high marks in all of his classes demonstrated that D.S. had made academic progress during the 2006-2007 school year. To Bayonne these high marks seemed particularly significant because its Director of Special Services Carol Trojan and its learning consultant Hackler testified that standardized test scores were not a reliable indicator of academic progress. Yet there was a clear and well-defined dispute between the two camps of expert witnesses with respect to the significance of the results of standardized testing when compared to the grades in school. In this regard we point out that contrary to Trojan's

18

and Hackler's views, DiDonato, Banyan School consulting psychiatrist Dr. Steven Tobias, and Brooks testified that standardized tests were a better measure of academic progress than grades, which can be subjective. Through their testimony and evaluation reports, Appellants' witnesses expressed their belief that D.S. was not receiving meaningful educational benefits at Bayonne High School.

On March 6, 2008, the ALJ issued her decision. After reviewing "the applicable law, the evidence and credible testimony," she made 71 separate findings of facts. App. at 39. These findings included her conclusions that the November 2006 IEP conference was completed without agreeing to incorporate into the IEP any of the recommendations outlined in the reports from the neuropsychological, speech-language, and central auditory processing evaluations, or from teachers. Moreover, she found that the IEP did not provide goals or address D.S.'s need for reading and language remediation and speech therapy or his weak auditory memory skills and socialization issues.

The ALJ ultimately concluded that Bayonne had failed to create an IEP for D.S. sufficient to address his educational needs, and that as a result D.S. had not received a free and appropriate public education conferring a meaningful educational benefit in the least restrictive environment, and thus his education did not satisfy federal law. After considering the testimony from the psychologist at the Banyan School and taking into consideration the evaluations and assessments regarding D.S.'s educational and social needs, the ALJ concluded that the Banyan School would be

19

an appropriate placement and ordered his placement there at Bayonne's expense, a direction carried out in April 2008.[5]

## 2.      District Court Proceedings

Following the ALJ's decision and D.S.'s transfer to the Banyan School, Appellants filed a complaint in the District Court requesting reimbursement from Bayonne for attorney's fees and costs incurred in the administrative action pursuant to 20 U.S.C. § 1415(i)(3)(B). Bayonne countered with its own complaint requesting that the District Court reverse the ALJ's decision providing for the Banyan School placement. The District Court consolidated the cases and, on the basis of the record from the administrative proceedings, in a letter opinion dated November 14, 2008, and order entered November 19, 2008, denied Appellants' request for reimbursement for attorney's fees and costs and reversed the decision of the ALJ as the Court concluded that Bayonne had provided D.S. with an education that met federal requirements in its public schools.[6] The Court predicated its conclusion principally on the bases that D.S. had received high grades

---

[5]According to Appellants' brief, the Banyan School placement has been continued at their expense since the time that the District Court reversed the decision of the ALJ thereby relieving Bayonne of the obligation to pay D.S.'s expenses at that school.

[6]The parties in their briefs do not indicate that they offered to present live evidence in the District Court.

20

during the 2006-2007 school year, an achievement that it believed the ALJ failed to consider, and its belief that the ALJ "over-relied on D.S.'s standardized test scores when reaching her decision." App. at 11. Furthermore, the Court also considered that D.S.'s teachers were using a multi-sensory learning approach and were following certain of Appellants' consultants' recommendations.

## III. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction to review the decision of the state educational agency under 20 U.S.C. § 1415(i)(2), and we exercise jurisdiction over the final order of the District Court pursuant to 28 U.S.C. § 1291. When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as "modified de novo" review. See P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009) (quoting S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 269-70 (3d Cir. 2003)). Under this standard, a district court must give "due weight" and deference to the findings in the administrative proceedings. Id. (citing Rowley, 458 U.S. at 206, 102 S.Ct. at 3051). "'Factual findings from the administrative proceedings are to be considered prima facie correct,' and if the reviewing court does not adhere to those findings, it is 'obliged to explain why.'" Id. (quoting State-Operated Sch. Dist. of Newark, 336 F.3d at 270). The "due weight" obligation prevents district courts from imposing their own view of preferable educational methods on the states. Oberti

21

v. Bd. of Educ., 995 F.2d 1204, 1219 (3d Cir. 1993) (citing Rowley, 458 U.S. at 207, 102 S.Ct. at 3051).

Even though on an appeal in an IDEA case from a decision of an ALJ a district court exercises a modified de novo standard of review, when, as here, an ALJ has heard live testimony and determined that one witness is more credible than another witness, her determination is due special weight. Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 199. "Specifically, this means that a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.'" Id. (quoting Carlisle Area Sch., 62 F.3d at 529) (emphasis in original). In Shore we opined that in this context, the word "justify" requires that the applicable standard of review be essentially the same as that a federal appellate court applies when reviewing a trial court's findings of fact. Id.

Within the confines of these standards, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private educational placement, and a direction for the provision of a compensatory education. See A.W. v. Jersey City Public Schs., 486 F.3d 791, 802 (3d Cir. 2007) (en banc); Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1034 (3d Cir. 1993). We review a district court's findings of fact for clear error, but we exercise plenary review over the legal standards that a district court applies and over its legal conclusions. Mary T. v. Sch. Dist. of Philadelphia,

22

575 F.3d 235, 242 (3d Cir. 2009) (citing Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 199).

IV.  DISCUSSION

The District Court reversed the ALJ's finding that D.S.'s ninth grade IEP was inappropriate.  "The issue of whether an IEP is appropriate is a question of fact."  State-Operated Sch. Dist. of Newark, 336 F.3d at 271 (citing Carlisle Area Sch., 62 F.3d at 526).  "When parents challenge [the adequacy of] a school's provision of a [free and appropriate public education] to a child, a reviewing court must (1) consider whether the school district complied with the IDEA's procedural requirements and (2) determine whether the educational program was 'reasonably calculated to enable the child to receive educational benefits.'"  Mary T., 575 F.3d at 249 (quoting Rowley, 458 U.S. at 207, 102 S.Ct. at 3051).  But a court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made.  Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 762 (3d Cir. 1995).

A.     Bayonne Complied with the IDEA's Procedural Requirements

23

The Supreme Court has made clear that the IDEA's "procedural safeguards cannot be gainsaid," as "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, as it did upon the measurement of the resulting IEP against a substantive standard." Rowley, 458 U.S. at 205-06, 102 S.Ct. at 3050 (internal citation omitted). Appellants argue that Bayonne ran afoul of the IDEA's procedural requirements because (1) D.S.'s ninth-grade IEP failed to program for D.S.'s areas of educational need, and (2) Bayonne failed to make timely responses to the letters Appellants sent to Bayonne on June 8, July 13, September 6, and October 30, 2006, requesting a meeting to discuss creating a ninth grade IEP for D.S. that incorporated the recommendations of Appellants' private evaluators.

Appellants' first argument misses the mark. The content of an IEP as such does not implicate the IDEA's procedural requirements for content is concerned with the IEP's substance, i.e., whether the IEP "reasonably [is] calculated to enable to enable the child to receive educational benefits." Id. at 207, 102 S.Ct. at 3051. Appellants' second argument, however, does present a procedural question. New Jersey regulations require a school district to respond in writing within 20 calendar days to inquiries such as those Appellants made in their letters. See N.J. Admin. Code § 6A:14-2.3(h)(5) (2010). Appellants' letters, however, remained unanswered for months. The District Court did not specifically address the implications of this delay, but it nevertheless found that the IDEA's procedural requirements were satisfied because Appellants played a "significant role"

24

in crafting D.S.'s IEP.  See Schaffer v. Weast, 546 U.S. 49, 53, 126 S.Ct. 528, 532 (2005).

We agree with the District Court on this point.  A procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits.  Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26, 127 S.Ct. 1994, 2001 (2007) (citing 20 U.S.C. § 1415(f)(3)(E)); J.L. v. Mercer Island Sch. Dist. 592 F.3d 938, 953 (9th Cir. 2010).  Thus, though it is important that a school district comply with the IDEA's procedural requirements, rather than being a goal in itself, such compliance primarily is significant because of the requirements' impact on students' and parents' substantive rights.  Here although Bayonne's initial unresponsiveness in the face of Appellants' concerns was unfortunate and undoubtedly frustrating to them, they ultimately had an opportunity to participate meaningfully in the creation of an IEP for D.S. that was in effect for most of his ninth-grade year.  Appellants and one of their outside experts (DiDonato) were present at the November 2006 IEP meeting at which they made suggestions, some of which were incorporated in the IEP.  Moreover, the revised IEP was presented to Appellants for their approval.

We are mindful that Appellants did not sign the IEP, but we have found levels of parental involvement similar to those in this case to be sufficient to comply with the IDEA.  See Fuhrmann, 993 F.2d at 1036.  Though Appellants contend that D.S. was deprived of educational benefits, this alleged deprivation cannot reasonably be traced to Bayonne's delay in

25

responding to Appellants' letters. In these circumstances we find that Bayonne substantially satisfied the IDEA's procedural requirements and that any deficiency in its compliance with the requirements is not a basis for granting relief to Appellants.

B. The District Court Failed to Afford Due Weight to the ALJ's Factual Findings

We now come to the heart of this appeal. In her decision, the ALJ found, "based on the scoring results from evaluations and assessments and the weight of testimony from teachers and medical experts," that D.S.'s ninth grade IEP failed to incorporate the recommendations necessary to address D.S.'s needs, which included:

> reading goals, individualized basic phonetics training, placement in a multi-sensory reading program that addresses reading comprehension skills (Lindamood-Bell, Wilson, or the Orton-Gillingham), intensive speech/language therapy, intensive auditory therapy regimens, an academic environment for small group language-based classroom instruction, remediation instruction for reading, writing, comprehension and spelling, usage of visual aids, FM desk-top amplification system and other educational supports.

App. at 57. The absence of these recommendations, or any alternatives reasonably calculated to confer an educational benefit to D.S., led the ALJ to find the IEP inappropriate.

The District Court reversed this finding because D.S.'s ninth grade IEP indicated that his teachers were using a multi-sensory learning approach and rephrasing and restating instructions when necessary as recommended by Appellants' educational consultants, the IEP incorporated a number of the consultants' other proposed recommendations, and, most significantly, D.S. received high marks in his ninth grade classes. The Court acknowledged that the IEP failed to contain reading goals and did not include all of the recommendations of the educational consultants, but stated that "even without these goals, D.S. received meaningful educational benefit during the 2006-2007 school year, as evidenced by the high marks D.S. earned." App. at 14.

We agree with the District Court that the IEP did incorporate certain instructional techniques that were consistent with Appellants' consultants' recommendations, such as "[t]ests/exams may be taken in the special education classroom with extended time," "[d]irections may be repeated/rephrased/clarified," "[b]reak down tasks into manageable units," "[p]rovide student with preferential seating," "[u]se drill and repetitive practice," and "[u]se multi-sensory approach." App. at 121-32. Nevertheless, we disagree with the District Court that the presence of these generalized instructions in the IEP contradicts the ALJ's ultimate factual conclusions—which a reviewing court is obliged to consider prima facie correct—that (1) in order for D.S.'s ninth grade IEP to be reasonably calculated to enable

27

D.S. to receive a meaningful educational benefit, it needed to incorporate the specific remedial techniques and provisions for accommodations that the teachers and evaluators who worked with him had proposed, and (2) the IEP failed to incorporate these specific remedial techniques and provisions for accommodations.[7]

---

[7]For example, the reports of Sgarlato-Inducci and Brooks both stated that D.S. needed an intensive remedial multi-sensory program for instruction in reading comprehension and writing, and recommended the use for that purpose of a program such as the Lindamood-Bell, Wilson, or Orton-Gillingham programs. By holding that inclusion of such a program was necessary for D.S. to receive a meaningful educational benefit, the ALJ implicitly accepted these reports as credible. In contrast to these specific recommendations, the IEP recommends only that D.S.'s English instructors "[u]se multi-sensory approach." App. at 121-22. This recommendation, as well as all the others in the "Goals and Objectives" section of the IEP, is repeated verbatim for each subject area.

We hasten to add that we are not holding that an IEP must incorporate specific remedial techniques and provisions for accommodations merely because evaluators propose them. After all, the team may have good reason to reject these proposals. Thus, we only are deciding that on this record the ALJ's conclusions with respect to remedial techniques and provisions for accommodations are unassailable and our opinion should not be read overly broadly.

28

As we have indicated, the District Court also found that the IEP was appropriate because the high grades that he received in all of his classes demonstrated that he made meaningful academic progress during his ninth grade year. It certainly was reasonable for the Court to consider D.S.'s academic progress in evaluating the appropriateness of the IEP for "evidence of a student's later educational progress may [] be considered in determining whether the original IEP was reasonably calculated to afford some educational benefit." Fuhrmann, 993 F.2d at 1040. Moreover, the Supreme Court has indicated that a special education student who "is being educated in the regular classrooms of a public school system" and who is performing well enough to advance from grade to grade generally will be considered to be receiving a meaningful educational benefit under the IDEA. Rowley, 458 U.S. at 203, 102 S.Ct. at 3049. Nevertheless, though the Court has stated that the "grading and advancement system" constitutes "an important factor in determining educational benefit," it also has made clear that it was not holding "that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'" Id. at 203 & n.25, 102 S.Ct. at 3049 & n.25.

D.S., however, was not being educated in Bayonne's regular classrooms. To the contrary, Bayonne was giving him all of his academic instruction in classes composed entirely of special education students in its "cluster" program. The District Court apparently did not view this distinction as significant because "[i]n Bayonne, state core curriculum standards underlie the core curriculum content for all of its students, including special education students." App. at 11.

29

Rowley, however, does not support the District Court's position that high scores achieved in special education classrooms are unambiguous evidence of an IEP's sufficiency. In this regard it is important to reiterate that in Rowley the Supreme Court made its statements regarding the limited significance of grade-to-grade advancement in the situation before it in which the "mainstreaming" preference of the IDEA had been met and the Court was "presented with a handicapped child . . . who is performing above average in the regular classrooms of a public school system." Rowley, 458 U.S. at 202-03, 102 S.Ct. at 3049 (emphasis added). Thus, our reading of Rowley leads us to believe that when the "mainstreaming" preference has not been met so that high grades are achieved in classes with only special education students set apart from the regular classes of a public school system, the grades are of less significance than grades obtained in regular classrooms.

Moreover, quite aside from Rowley, our precedents do not afford the significance the District Court afforded to D.S.'s high scores in special education classrooms in this case for we consistently have declined to adopt bright line rules to determine whether a student is receiving a meaningful educational benefit under the IDEA. See, e.g., Ridgewood Bd. of Educ., 172 F.3d at 247 (what benefit is "appropriate" under the IDEA is gauged in relation to child's potential); Polk, 853 F.2d at 184 ("The educational progress of a handicapped child . . . can be understood as a continuum where the point of regression versus progress is less relevant than the conferral of benefit."); Carlisle Area Sch., 62 F.3d at 534 (". . . the [IDEA] requires that school districts prepare the IEP's based on the student's needs; so long as the IEP

30

responds to the needs, its ultimate success or failure cannot retroactively render it inappropriate."). Overall, we think that it is clear that a court should not place conclusive significance on special education classroom scores, a conclusion that we believe is reinforced by the circumstance that, as here, there may be a disconnect between a school's assessment of a student in a special education setting and his achievements in that setting and the student's achievements in standardized testing.[8] When there is such a disconnect we think that there should be an especially close examination of the appropriateness of the student's education.

We recognize that the District Court reached its conclusion on the basis of testimony from Carol Trojan, Bayonne's Director of Special Services, who testified in the administrative proceedings that D.S., by receiving high marks in his special education classes, demonstrated mastery of the regular ninth grade curriculum just as if he was in a regular classroom, and whose testimony was recorded in the ALJ's decision. Appellants' witnesses, on the other hand, thoughtfully expressed their beliefs that D.S. had not made grade level progress during the 2006-2007 school year. App. at 21-23 (summarizing DiDonato's testimony). The ALJ chose to credit Appellants' witnesses, and, under the applicable standard of review the District Court was not at liberty to credit the witnesses who expressed a contrary

[8]We are not implying that we question the integrity of Bayonne's marking system for special education students. Quite to the contrary, we merely are considering the significance of D.S.'s achievements within the context of the entire case.

31

opinion without a showing that there was good reason to do so, a showing that Bayonne did not make.  See Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 200.

The District Court also supported its conclusion by stating that the ALJ over-relied on D.S.'s standardized test scores, i.e., his 2006 scores on the WIAT tests and his 2007 scores on the Woodcock-Johnson tests.  The Court stated that Appellants had failed to meet their burden of showing that an apt comparison can be made between scores from the two different types of tests.  But the ALJ heard testimony regarding the standardized testing and on the basis of that testimony used the test results to measure D.S.'s progress.  Moreover, the District Court did not point to nontestimonial evidence that undermined the ALJ's conclusion on this point. If we give as we should "due weight" to the ALJ's determination that D.S.'s ninth grade IEP was not reasonably calculated to enable D.S. to receive a meaningful educational benefit, we find no basis in the record for overturning that determination.  See Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 201.  Accordingly, the District Court's contradictory determination was clearly erroneous.  See id.

V. CONCLUSION

For the reasons set forth above, we will reverse the order of the District Court of November 19, 2008, and remand the case for entry of judgment in favor of the Appellants to the end that the ALJ's decision of March 6, 2008, that Bayonne was not supplying D.S. with a free and appropriate

32

public education and that the Banyan School would be an appropriate placement so that D.S. be placed in that school at Bayonne's expense, is reinstated. In this regard we note that Appellants in their brief indicate that they are seeking reimbursement for their tuition and transportation costs in continuing D.S. in the Banyan School after the District Court reversed the ALJ's decision. We, however, will leave the determination of the precise relief to be given to Appellants to the District Court on the remand. In addition on the remand the District Court should determine the amount of attorney's fees, costs, and interest for which Bayonne is responsible.