**N.M., by and Through His Parents and Natural Guardians, W.M. and L.M., and W.M. and L.M., Individually, Plaintiffs**

v.

**CENTRAL BUCKS SCHOOL DISTRICT, Defendant.**

Civil Action No. 11–3272.

United States District Court, E.D. Pennsylvania.

Jan. 16, 2014.

Michael J. Connolly, Stephen J. Jacobson, Connolly Jacobson Depietro & John LLP, Doylestown, PA, for Plaintiffs.

Christine M. O'Brien, Scott H. Wolpert, Timoney Knox LLP, Fort Washington, PA, for Defendant.

### ORDER

NITZA I. QUIÑONES ALEJANDRO, District Judge.

**AND NOW,** this 15th day of January 2014, upon consideration of the Report and Recommendation of United States Magistrate Judge Lynne A. Sitarski dated December 19, 2013 [ECF 20], and no objections filed thereto, it is hereby ORDERED that:

1. The Report and Recommendation is **APPROVED** and **ADOPTED.**

2. Plaintiffs' motion for judgment on the administrative record [ECF 10] is **DENIED.**

3. Defendant's motion for judgment on the administrative record [ECF 11] is **GRANTED.**

### REPORT AND RECOMMENDATION

LYNNE A. SITARSKI, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiffs, W.M. and L.M. (collectively the "Parents"), and their minor son N.M. (collectively "Plaintiffs") bring this action

against the Central Bucks School District (the "District") alleging that the District failed to provide N.M. with a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"), section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, ("ADA"). (ECF No. 1 (Compl.).) Plaintiffs and the District have filed cross-motions for judgment on the administrative record. (ECF No. 10 (Pls. Mot.); ECF No. 11 (Def's. Mot.).) On October 29, 2013, the Honorable Nitza I. Quiñones Alejandro referred these cross-motions to me for a Report and Recommendation. (ECF No. 19 (Order).)

For the reasons set forth herein, I **RESPECTFULLY RECOMMEND** that the Court **DENY** Plaintiffs' motion (ECF No. 10); and **GRANT** the District's motion (ECF No. 11).

## II. BACKGROUND

### A. Statutory Framework

In *D.S. v. Bayonne Bd. of Educ.*, the United States Court of Appeals for the Third Circuit explained the IDEA'S statutory framework:

> The IDEA requires that states to receive [sic] federal education funding make available a [FAPE] to all children with disabilities residing within their borders. 20 U.S.C. § 1412(a)(1). In particular, the IDEA specifies that the education the states provide to these children "specially [be] designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3042, 73 L.Ed.2d 690 (1982) (internal quotation marks omitted). Although

a state is not required to supply an education to a handicapped child that maximizes the child's potential, it must confer an education providing "significant learning" and "meaningful benefit" to the child. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999). . . .

The IDEA contemplates that school districts will achieve these goals by designing and administering a program of individualized instruction for each special education student set forth in an Individualized Education Plan ("IEP"). 20 U.S.C. §§ 1412(a)(4), 1414(d). . . . "An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 589 (3d Cir.2000) (citing 20 U.S.C. § 1401(a)(20)). A team consisting of the student's parents and teachers, a curriculum specialist from the local school district, and, if requested, a person with special knowledge or expertise regarding the student must develop an IEP. 20 U.S.C. § 1414(d)(1)(B). The IEP team will review the IEP at least annually to determine whether the stated goals for the student are being achieved. 20 U.S.C. § 1414(d)(4). When appropriate the team will revise the IEP to address, among other things, lack of progress, necessary changes arising from reevaluation of the child, and parental input. 20 U.S.C. § 1414(d)(4).

Though the IEP must provide the student with a "basic floor of opportunity," it need not necessarily provide "the optimal level of services" that parents might desire for their child. *See Holmes*, 205 F.3d at 590 (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 533–34 (3d

Cir.1995)). Nevertheless, "at a minimum, '[t]he IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'" *Chambers v. Philadelphia Bd. of Educ.*, 587 F.3d 176, 182 (3d Cir.2009) (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir.2004)). When a state is unable to provide a [FAPE] to a child but a private school can provide that education, the state must reimburse the child's parents for the private school costs. *[L.E. v.] Ramsey Bd. of Educ.*, 435 F.3d [384,] 389–90 [ (3d Cir.2006) ] (citing *[T.R. v.] Kingwood Twp. Bd. of Educ.*, 205 F.3d [572,] 577 [ (3d Cir.2000) ] ).

If parents believe that an IEP fails to provide their child with a [FAPE], they may challenge the IEP in an administrative proceeding. 20 U.S.C. § 1415(b)(6).... At an administrative hearing challenging an IEP, the party seeking relief bears the burden of proof. *Ramsey Bd. of Educ.*, 435 F.3d at 392 (citing *Schaffer v. Weast*, 546 U.S. 49, 62, 126 S.Ct. 528, 537, 163 L.Ed.2d 387 (2005)). A party to the due process hearing aggrieved by its outcome has the right to bring a civil action challenging the decision ... in a federal district court, without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2).

602 F.3d 553, 556–58 (3d Cir.2010) (third and fourth brackets in original).

The Third Circuit has also recognized that a school district must design an IEP to permit a student to make "meaningful educational progress." *M.C v. Central Regional Sch. Dist.*, 81 F.3d 389, 394 (3d Cir.1996) (finding that residential program was required for student to make meaningful educational progress where student "could no longer make adequate progress in a day setting"). Other courts have clarified that: "An IEP confers a meaningful educational benefit when it is more than a trivial attempt at meeting the educational needs of the student, and it is designed to offer the child the opportunity to make progress in all relevant domains under the IDEA, including behavioral, social and emotional." *Breanne C. v. Southern York Cnty. Sch. Dist.*, 732 F.Supp.2d 474, 483 (M.D.Pa.2010) (citing *M.C.*, 81 F.3d at 394).

## B. Factual Background[1]

### 1. 2006 Initial Evaluation Report

According to a January 23, 2006 initial evaluation report ("IER") conducted when N.M. was in the fifth grade, N.M. has struggled academically since kindergarten. (ECF No. 1 at 37 (Admin. Decision) at 2–3; P–1 (IER) at 2).)[2] An August 12, 2010, Reevaluation Report describes N.M. "as a student with [a] specific learning disability, he also meets the eligibility classification for special education services as a student with an Other Health Impairment, as a result of his Post Traumatic Stress Disor-

---

**1.** In deference to the state hearing officer's (the "H.O.") findings of fact, the background is taken predominately from the H.O.'s decision. I provide direct citations to the record and have included more information than is found in the H.O.'s decision to provide additional context. To the extent any fact is inconsistent with the hearing officer's finding of fact, I have explained why I have reached a contrary conclusion. I have also directly cited the H.O.'s decision where his factual find-

ings may be his own conclusions based on his interpretation of the evidence.

**2.** The Administrative Decision is attached to the Complaint as Exhibit A. (ECF No. 1 at 34–51.) References to documents beginning with the letter "P" refer to Plaintiffs' exhibits in the administrative transcript, and those materials that use the reference letter "S" constitute the District's documents. (*See* ECF No. 1 at 37.)

der and Generalized Anxiety Disorder diagnoses." (P–21 (Reevaluation Report) at 17; *see* ECF No. 1 at 37.)

In the IER, the District found that his reading ability was instructional at a grade level of three and a half. (P–1 at 4, 9 (emphasis in original).) On a writing test, N.M. performed well below average. (P–1 at 9–10.)[3] The Behavioral Assessment System for Children Second Edition ("BASC–2")[4] categorized N.M. as "Clinically Significant" for anxiety, depression and the overall "Internalizing Problems Composite." (ECF No. 1 at 37; P–1 at 10–11.) A behavior evaluation reported that: "In school, [N.M.] sometimes seems lonely, is often sad, and is often pessimistic and sometimes cries easily. Socially, he sometimes complains about being teased and has trouble making new friends." (ECF No. 1 at 37; P–1 at 11.) The IER stated:

> Review of this assessment and BASC–2 data reveals a youngster with overt depressive and anxious symptomology that seems to be impacting his academic and social performance in the classroom. . . . These anxious and depressive characteristics are clinically significant and warrant further consideration by the medical personnel currently treating [N.M.] for his anxiety and mood disorder. [N.M.] is a gentle, sensitive, and fragile youngman who could experience more success at school socially and academically given the increased interventions and modifications. [N.M.]'s academic program will include specially designed instruction to support him in reading and writing. These changes in his programming may slowly increase his confidence to approach and complete tasks independently. It will be necessary to continue ongoing home/school communication to obtain optimal information regarding [N.M.]'s emotional and medication status. Therefore, the school will be best prepared to plan accordingly if additional behavior interventions need to be implemented with [N.M.'s] educational programming.
>
> . . . .
>
> Additionally, social emotional functioning should be monitored closely as this is expected to improve with the implementation of specially designed instruction and as [N.M.] begins to feel more successful academically. His parents may wish to continue to pursue issues related to his social-emotional functioning, more specifically with a mental health professional.

(P–1 at 12–14.)

### 2. Sixth Grade (2007–08)

On March 6, 2008, when N.M. was in the sixth grade, an IEP team drafted an IEP (the "March 2008 IEP"). (P–3 (IEP) at 3.) The March 2008 IEP reported:

> [N.M.] has shown steady growth in the area of reading. When Comparing [sic] the qualitative [sic] Reading Inventory (QRI) scores from last year to this year [N.M.] has shown a minimum of a years [sic] growth in the areas of wod [sic] identification, fluency, accuracy, and passage comprehension. [N.M.] increased his wod [sic] list scores to a fifth grade instructional level from a fourth grade instructional level. [N.M.] was

---

**3.** The parties do not discuss the purpose of the various tests that are identified throughout the underlying record. (*See* ECF Nos. 10 & 11.) The test was the Test of Written Language–Third Edition (TOWL–3). (P–1 at 9.)

**4.** The BASC–2 is "an integrated system designed to facilitate the differential diagnosis and classification of a variety of emotional and behavioral disorders in children." (P–1 at 10.)

also able to increase his fluency from 86 word [sic] per minute on a fourth grade passage, to 80 words per minute on a sixth grade passage. [N.M.] was also able to read the sixth grade passage with 96% accuracy, showing an increase in word identification skills within context. (P–3 at 5.) [5] With respect to writing, N.M. achieved basic scores at the rough draft stage, and, at the final draft stage, he improved to predominately proficient scores.[6] (*Id.* at 7.) The March 2008 IEP established writing, reading, self-regulation and learning behaviors goals (P–3 at 11–15) [7], but it did not assess his emotional needs (ECF No. 1 at 38; *see* P–3 at 6–7).

N.M.'s mother stated that N.M. had always had issues making friends. (ECF No. 1 at 39; Hr'g Tr. at 57:22–23.) Yet, Luther Reed ("Reed"), N.M.'s sixth grade special education teacher, stated that he was not personally aware of any bullying or inappropriate social interactions in school. (Hr'g Tr. at 1276:18–19; 1290:5–1291:19; 1364:16–1368:13, 1371:11–19.)

However, Reed did speak with the Parents about an incident outside of school. (ECF No. 1 at 39; Hr'g Tr. at 1374:18–1375:4.) Reed characterized N.M.'s sixth grade experience as "very successful not only academically, but [N.M.] seemed to also enjoy the 6th grade year as well." (Hr'g Tr. at 1376:1–6.)

### 3. Seventh Grade (2008–09)

On September 10, 2008, N.M.'s IEP team prepared another IEP (the "Sep. 2008 IEP"). (P–4 (IEP) at 1.) The Sep. 2008 IEP had almost all the same goals as the March 2008 IEP.[8] (ECF No. 1 at 39; P–4 at 11–14.)

During his seventh grade year, the school was aware of the following social issues:

- Before the seventh grade began, N.M.'s mother asked Kathryn Mallon ("Mallon"), N.M.'s school counselor, to schedule N.M. away from two other students; and Mallon made such arrangements. (Hr'g Tr. 617:17–18; 619:10–12; 630:9–631:7.)

**5.** The QRI is "a research based reading inventory that assesses word identification, reading fluency, and reading comprehension skills. (P–3 at 6.)

**6.** His writing was evaluated in the categories of focus, content, organization, style, and conventions. (P–3 at 7.) At the rough draft stage, N.M. received: one "3" (rated as proficient), three "2s" (rated as basic), and one "1" (rated as below basic). At the final draft stage, N.M. received four "3s" and one "2". (*Id.*) On a test, entitled "Three–Minute Writes," the District assessed Correct Word Sequences ("CWS"). (*Id.* at 6–7.) His baseline score was a 22, he also received a 24 and 21. (*Id.* at 7.) The March 2008 IEP does not explain the scores' significance. (*See id.*)

**7.** Specifically, the goals are: (1) "increase writing levels in the area of content, style, and conventions from below basic and basic scores to proficient[;]" (2) "write 47 correct word sequences from a baseline of 22 cws[;]" (3) "given fluency drills at 5th grade level [N.M.] will will [sic] increase oral reading fluency from baseline of 75wpm to 100 wpm 95% accuracy[;]" (4) given a reading passage "read and answer 10 explicit and 10 implicit comprehension questions with 75% accuracy[;]" and (5) when presented with an academic task "increase the overall learning to learn and self regulation behaviors in order to complete the task." (ECF No. 1 at 38–39; P–3 at 11–15.) Initially, the fourth goal contained a typographical error stating that the reading passage would appropriate for a seventh grade level, but the passage should have stated a sixth grade level. (ECF No. 1 at 39 n. 2; Hr'g Tr. at 1329.) The District, however, made the appropriate assessment. (ECF No. 1 at 39 n. 2; Hr'g Tr. at 1329–34.)

**8.** The CWS score goal was removed, because the middle school assessed his abilities related to word sequence using a different system. (Hr'g Tr. at 1475–76.)

- In late February and early March of 2009, N.M. was involved in two incidents with another student. (ECF No. 1 at 40–41.) N.M.'s mother reported the later incident to Mallon who rescheduled the other student's classes so that the other student shared only one class with N.M. (ECF No. 1 at 40–41; Hr'g Tr. at 639: 13–16; 642:7–9.) Kevin Marton ("Marton"), the assistant principal, stated that the other student was also disciplined on each occasion. (Hr'g Tr. 493:17–18; 495:3–4; 504:16–505:7.)

- In May of 2009, N.M.'s mother contacted Mallon about another student from the neighborhood who had been bullying N.M., but N.M.'s mother declined Mallon's offer of assistance, wanting to deal with the issue herself. (Hr'g Tr. at 645:4–646:2.)

Neither Mallon nor Marton were aware of any other incidents during the remainder of the seventh grade. (ECF No. 1 at 41; Hr'g Tr. at 644:11–19.) N.M. had one special education teacher, Lisa Ring ("Ring"), from September through January of 2009, and another, Nichole Taylor ("Taylor"), from February to June of 2009. (Hr'g Tr. at 773:11–12, 784:3–10, 1460:6–10; 1467:5–17.) Ring did not observe any social problems between N.M. and any other students. (ECF No. 1 at 40; Hr'g Tr. at 1516:8–1517:10.) Taylor was familiar with, and communicated with N.M.'s mother regarding the incidents between N.M. and the student in February and March of 2009, but otherwise she was not aware of any other social problems. (ECF No. 1 at 41; P–39 (E-mail) at 1; Hr'g Tr. at 793:1–795:20.)

Progress reports show that with respect to fluency drills, N.M. was obtaining his goals (by reading at 97 words per minute on November 17, 2008, and 98 words per minute on January 30, 2009). (S–17 (Goal Progress) at 10.) In connection with his reading passage goal, N.M. was also reaching his goal (receiving comprehension scores of 75% on November 14, 2008, 100%) on November 20, 2008, and 93% on January 30, 2009). (ECF No. 1 at 40; S–17 at 11–12.)

On March 4, 2009, N.M.'s IEP team developed an IEP (the "March 2009 IEP"). (P–5 (IEP) at 3.) It described N.M.'s academic achievement, in relevant part, as follows:

Reading:

Based on a Qualitative Reading Inventory administered on 2/24/09, [N.M.] is reading at a 5th grade instructional level with a word recognition score of 96%, fluency of 84 words correct per minute, and comprehension of 6/8 of 75%. [N.M.] is working on the Read 180 program and is currently on level 3 with a lexile score of 466 (below basic). [N.M.'s] vocabulary score is 81% at this time. [N.M.] turns in assignments on time, shows evidence of effort, and is helpful and pleasant. Current Grade: B+

Writing:

As of 2/18/09, [N.M.]'s writing assessment showed that he has needs in the areas of content, conventions, and focus. [N.M.] is able to write a 5 paragraph essay but needs to expand on his thoughts and ideas and make sure that all details of supporting sentences and paragraphs relate to the main idea. Current Grade: B

(P–5 at 7.)

The March 2009 IEP established three goals for N.M. and an April 14, 2009, Goal Progress document reports advancement:

- One goal was that when N.M. was provided with a reading passage at his instructional level, his reading

fluency would improve from a baseline of 84 WPM with an accuracy of 96%, to 100 WPM with an accuracy of 99%. (ECF No. 1 at 40; P–5 at 9–11.) In fact, his reading fluency on April 14, 2009, was at 99 words correct per minute and, on June 9, 2009, his reading fluency was 91 words correct per minute. (S–17 (Goal Progress) at 14.) Taylor explained that his score decreased, but his reading level, which was at a sixth grade level, increased to a seventh grade level. (P–50 (Teacher's Rep.) at 1; Hr'g Tr. at 817:19–818:8.)

- Another goal was that when presented with reading passages, N.M. would demonstrate growth in reading comprehension with respect to explicit and implicit reading strategies moving from a baseline of 75% to 85%. (ECF No. 1 at 40; P–5 at 9–11.) Indeed, on April 14, 2009, N.M. was at level three in the Read 180 program with a lexile score of 342 (below basic), a comprehension score of 96% and a vocabulary score of 79%. (ECF No. 1 at 41; S–17 at 15.) In June, 2009, N.M. obtained a 307 lexile score, a 97% comprehension score, and a 80% vocabulary score. (*Id.*)

- Another goal for N.M., with respect to writing, was that he "use prewriting strategies to complete a narrative and persuasive sample of at least five paragraphs," each with certain compositional elements, with 80% accuracy. (ECF No. 1 at 40; P–5 at 9–11.) N.M.'s scores on his written work were 85% and 80% in April and

June of 2009, respectively. (P–5 at 16.)

#### 4. Eighth Grade·(2009–10)

In the summer of 2009, in response to the Parents' request, Mallon· scheduled N.M.'s classes and "teams" so that he would be separated from certain students with whom he had conflicts. (Hr'g Tr. 647:20–648:14.)[9] Around this time, Marton spoke with N.M.'s father about programs to address concerns about bullying. (*Id.* at 509:1–20.) Marton collaborated with teachers to develop a plan to "quickly" address "any issues that came up." (*Id.* at 510:1–8.) They placed N.M.'s locker in a highly visible area; set up a meeting with Mallon "so that [N.M.] had an outlet, a place to go if anything had come up"; and Marton met with N.M. "to help him feel as comfortable as possible as [they went] into the school year . . . ." (*Id.* at 510:9–25.)

Nevertheless, N.M. was involved in a series of school-related incidents: ·

- In September ·of 2009, N.M. did not try out for tennis;, because some students said "it was a girl's sport." (Hr'g Tr. at 652:7–653:1.) After N.M. informed Mallon about this incident, Mallon talked to the tennis coach, who allowed N.M. to come onto the team late. (*Id.* at 653:12–19.)

- In November of 2009, N.M. was involved in an incident with a student on the bus. (S–41 (Detention slip) at 2.) According to the Bus Report, N.M. and the other student exchanged some words. (S–41 (Bus Report) at 3.) Then, the other stu-

---

**9.** The H.O. wrote that this action occurred in "the summer of 2008," but I find that the evidence clearly demonstrates that this is a typographical error. The comment is under the heading "8th Grade (2009–2010)" and the portion of the hearing transcript that is cited (*see* ECF No. 1 at 41) relates to Mallon's testimony in which she stated that the scheduling occurred during June or July of 2009 (Hr'g Tr. at 647:20–22).

dent punched N.M. in the shoulder and N.M. hit the other student in the leg. (*Id.*) N.M. received a warning and the other student received a Saturday detention. (*Id.*) During the investigation, the other student reported that N.M. had made comments about suicide. (S–41 (Student Report) at 4–5.) The District followed up with the Parents. (Hr'g Tr. at 525:23–526:6.)

- In January 2010, N.M.'s mother called Mallon to talk about an "attendance exception" because she stated that N.M. was enduring "constant bullying." (Hr'g Tr. at 655:22–656:6.) N.M.'s mother also asked Mallon about private schools. (*Id.* at 656:7–657:5.)

- In February 2010, N.M.'s mother reported that someone on the bus threatened to kill N.M. (*Id.* at 533:21–25.) After an investigation, the District found no support for the accusation. (*Id.* at 534:3–536:10.)

- In February 2010, N.M. reported two same-day incidents involving tripping, shoving and a verbal exchange on his way to and from gym class. (*Id.* at 543:19–544:4.) The District examined videotape of the hallway near the gym and interviewed students. (*Id.* at 544:5–18.) The District was unable to verify any physical altercation, but did corroborate the verbal exchange. (*Id.* at 544:15–20.) The school disciplined the student involved in the verbal exchange with a Saturday detention. (*Id.* at 544:22–25; S–41 (Detention Slip) at 7.)

Mallon testified that, despite these incidents, she did not observe anything about N.M.'s behavior or demeanor that concerned her. (Hr'g Tr. at 652:2–6.) Marton stated that besides the aforementioned

incidents, N.M., the Parents, teachers and other students did not report that N.M. was being bullied or having difficult peer interactions. (*Id.* at 517:22–518:1; 530:4–8; 530:23–531:5; ECF No. 1 at 42.) The District witnesses stated that they did not observe any social, emotional, or bullying issues and, when reported, the District acted in N.M.'s best interest to investigate and, if necessary, address such incidents. (ECF No. 1 at 43.)

The District continued to track N.M.'s academic progress. According to the Goal Progress report, on November 3, 2009, N.M. was reading 104 words per minute with 99% word accuracy; scoring at a lexile level of 260 on the Scholastic Reading Inventory ("SRI") (in the Below Basic range). (S–17 (Goal Progress Rpt.) at 14, 15 & 17.) In February 2010, he was reading 117 words per minute with 98% word accuracy; scoring at a lexile level of 370 on the SRI (in the Below Basic range). (*Id.*) On November 3, 2009, he was answering comprehension questions with 100% accuracy; and his writing sample demonstrated clear organization, simple sentences, some errors and overall scored a four out of six. (*Id.*) In February 2010, he was answering comprehension questions with 100% accuracy; and his writing sample demonstrated clear organization, variety of sentence structures, some errors and overall scored a five out of six. (*Id.*)

On February 22, 2010, the Parents removed N.M. from school based on his psychiatrist's order for homebound instruction. (P–15 (Homebound Instruction Notice) at 2–4.) That same day, they notified the District that they were seeking a private placement at the District's expense. (P–8 (E-mail) at 1–2.)

On March 3, 2010, the IEP team drafted an IEP (the "March 2010 IEP") which states:

[N.M.]'s sight word vocabulary and word recognition skills are independent through the 6th grade level and instructional at the Upper Middle School grade level. On the 6th grade level reading passage, [N.M.] read with 99% accuracy with 93.5 words correct per minute and answered 6 of 8 comprehension questions correctly. On the Upper Middle School level reading passage, [N.M.] read with 99% accuracy with 85 words correct per minute and answered 7 of the 10 comprehension questions correctly. In terms of accuracy and comprehension, he is in the instructional range at the Upper Middle School grade level for the QRI IV.

[N.M.]'s lexile level based on the [SRI] given to him in January of 2010 is 370. The January average for 8th grade students is 910.

(P–7 (March 2010 IEP) at 7 & 11.) The March 2010 IEP repeated N.M.'s February 2010 progress monitoring results in writing. (*Id.* at 13.) According to the state Hearing Officer ("H.O."), "[t]he March 2010 IEP is largely the same as prior IEPs offered in March 2008 and March 2009." (ECF No. 1 at 44.) On March 10, 2010, N.M. withdrew from the District (S–25 (Withdrawal Form) at 1), and, the following day, he began to attend a private placement at New Hope Academy ("NHA") (Hr'g Tr. at 901:7–13.)

### 5. Reevaluation & August 2010 IEP

On August 12, 2010, the District issued a Reevaluation Report, identifying N.M. as having a disability in mathematics and other impairments due to PTSD and general anxiety. (P–21 (IEP) at 18.) [10] One of N.M.'s Parents and his science teacher rated him as clinically significant for anxiety, depression, and withdrawal, but his special education teacher did not rate any behavior as clinically significant. (P–21 at 13–17.) [11] On August 23, 2010, N.M.'s IEP team drafted an IEP (the "Aug. 2010 IEP") that "contained significant changes to address the social/emotional needs of the student." (ECF No. 1 at 45.) The Aug. 2010 IEP contained new goals to address mathematics and his feelings of frustration or being overwhelmed in the school environment. (P–22 (IEP) at 19–26.) It also provided a Behavioral Intervention Plan providing for coping skills, social skills, and self-regulating breaks. (*Id.* at 36–37.)

### 6. Hearing Officer's Decision

The Parents brought an administrative proceeding, seeking compensatory education for the period running form March 31, 2008 to March 10, 2010. (ECF No. 1 at 36.) Additionally, they requested reimbursement for N.M.'s tuition at NHA. (*Id.*) On February 22, 2011, the H.O. denied their claim. (*Id.* at 50.) He concluded that the evidence presented a close case, but the parents had not met their burden of persuasion, because the record did not preponderantly weigh in their favor. (*Id.*)

The H.O. explained that the Parents had not shown that the District denied N.M. a FAPE with respect to reading:

---

**10.** On March 11, 2010, the District requested the Parents' permission to complete an educational reevaluation (P–10 (Letter) at 1), and subsequently explained that the evaluation was to be used in providing a FAPE for the 2010–11 school year (S–49 (Letter) at 1). On June 28, 2010, the Parents consented to the reevaluation. (S–49 (Reevaluation Form) at 5.)

**11.** The Parents and teachers did not provide a medical diagnosis. Rather, the Parents and teachers rated N.M. in connection with the BASC–2 assessment. (*See* P–21 at 13–14.) According to the August 12, 2010 Reevaluation Report, the BASC–2 gathered data from the Parents and teachers to provide a current evaluation of N.M.'s social emotional functioning. (*Id.* at 13.)

The most compelling evidence pointing toward a denial of FAPE centers on instruction in reading. Parents argue that from 5th grade onwards the student's reading level never advanced beyond 5th grade. (FF 8, 20, 22, 55). Overall quantitative measures of reading also seem to support a decline in reading skill over time. (FF 33, 45). But arrayed against this is a weight of evidence that indicates that the student made progress in reading, and arguably [obtained a] quite meaningful educational benefit. First, the day-to-day instruction as gauged through progress monitoring indicates that the student was instructional at levels beyond the 5th grade. (FF 14, 21, 48). Second, reading comprehension, while a significant need, has been generally been reported as strong. (FF 14, 20, 22, 33, 45, 48). Third, each of the student's special education teachers testified credibly that the student made progress in reading, and changes in the student's reading goals from year to year would seem to bear that out. (FF 13, 14, 26, 27, 50). This is not to say that the District's reading program was perfected for the student. Indeed, the myriad goals, assessments, progress monitoring, and teacher testimony makes it difficult to pin down exactly what the student's standing in reading is. But, on this record, the evidence is too close to conclude that the student was denied FAPE in reading. And, as such, the legal conclusion is that parents have not carried their burden.

(ECF No. 1 at 47–48.) The H.O. determined that in connection with writing instruction Plaintiffs had not shown that the District failed to provide a FAPE: "Finally, the record does not preponderantly support the claim that the student was denied FAPE through the District's programming in written expression. The baselines, goals and progress monitoring weigh in favor of a finding that the District provided FAPE in this regard. (FF 3, 2, 17, 23, 25, 34, 46, 49, 50, 58)." (ECF No. 1 at 49.)

The H.O. also explained its conclusion that Plaintiff failed to show a denial of a FAPE with respect to N.M.'s emotional needs or social issues:

There is also an argument to be made that the student was denied FAPE in the way the District handled the student's social/emotional needs. District personnel who worked with the student had rated the student for clinically significant behaviors in anxiety, depression, withdrawal, and internalizing problems. (FF 4, 59). There is clearly a pattern of student-reported incidents with peers. (FF 16, 29, 30, 31, 35, 36, 37, 38, 39, 40). And, ultimately, the District added goals and programming to support social and emotional needs for the student. (FF 60). But again, there is compelling evidence that the District did not deny the student FAPE in its handling of the student's social/emotional needs. First, the District was proactive in every regard in its response to those needs when such needs were brought to its attention. (FF 30, 35, 37, 38, 40, 43). Second, each District witness testified quite credibly that they saw no school-based difficulties with the student in terms of bullying or peer relations. (FF 15, 16, 28, 31, 42, 43). Indeed, the District was never dismissive of any parent or student inquiry or request in his regard; but the District witnesses were all quite credible when they testified that such reports surprised them because they observed no incidents as suggested in the reports and the student's general affect was engaged, pleasant, and seemingly not affected by the reported incidents.

That is not to say that the reports were fabricated or in anyway misleading. While there was testimony that the student may be prone to misperception or exaggeration in reporting events (FF 61, 62), nothing in the record suggests that events did not unfold as parents and student reported them. But on this record, parents have not carried their burden that the student was denied FAPE as the result of acts and omissions on the part of the District or that the District failed to provide FAPE through its educational programming regarding the student's social/emotional needs.

(ECF No. 1 at 48–49.)

### C. Procedural History

On May 19, 2011, Plaintiffs filed their Complaint. (ECF No. 1 (Compl.) at 28–32.) On July 21, 2011, the District filed an Answer (ECF No. 4 (Ans.).) On November 15, 2011, Plaintiffs and the District each separately filed their motion for judgment on the administrative record. (ECF Nos. 10 & 11.) The parties each separately filed responses to the arguments raised in opposing side's motion. (ECF No. 12 (Pls.' Resp.); ECF No. 13 (Def.'s Resp.).) On January 27, 2012, the district judge held a hearing on the parties' pending motions for judgment on the administrative record. (ECF No. 14 (Notation).) On October 29, 2013, Judge Nitza I. Quiñones Alejandro referred this case to the undersigned United States Magistrate Judge for a report and recommendation on the parties' pending motions. (ECF No. 19 (Ref. Order).)

### III. STANDARD OF REVIEW

The *Bayonne* Court described the standard a District Court should use:

When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as "modified de novo" review. *See P.P. v. West Chester Area Sch. Dist.,* 585 F.3d 727, 734 (3d Cir.2009) (quoting *S.H. v. State–Operated Sch. Dist. of Newark,* 336 F.3d 260, 269–70 (3d Cir. 2003)). Under this standard, a district court must give "due weight" and deference to the findings in the administrative proceedings. *Id.* (citing *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051). " 'Factual findings from the administrative proceedings are to be considered prima facie correct,' and if the reviewing court does not adhere to those findings, it is obliged to explain why.' " *Id.* (quoting *State–Operated Sch. Dist. of Newark,* 336 F.3d at 270). The "due weight" obligation prevents district courts from imposing their own view of preferable educational methods on the states. *Oberti v. Bd. of Educ.,* 995 F.2d 1204, 1219 (3d Cir.1993) (citing *Rowley,* 458 U.S. at 207, 102 S.Ct. at 3051).

602 F.3d at 564. The Third Circuit clarified that " 'whether the [School] District fulfilled its FAPE obligations ... are [sic] subject to clear error review as questions of fact.' " *D.K. v. Abington Sch. Dist.,* 696 F.3d 233, 243 (3d Cir.2012) (ellipse and bracket in original) (quoting *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.,* 585 F.3d 727, 735 (3d Cir.2009)).

With respect to credibility determinations, the *Bayonne* Court stated:

[W]hen, as here, an ALJ has heard live testimony and determined that one witness is more credible than another witness, her determination is due special weight. *Shore Reg'l High Sch. Bd. of Educ.,* 381 F.3d at 199. "Specifically, this means that a District Court must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would

*justify* a contrary conclusion." *Id.* (quoting *Carlisle Area Sch.,* 62 F.3d at 529) (emphasis in original).

602 F.3d at 564.

The IDEA does not permit a school district to make substantial changes to a child's educational program. Once a child has been placed in a special education program, the District may not arbitrarily change a program without providing the child's parents proper notice. 20 U.S.C. § 1415(b)(3) (requiring district to provide "Written prior notice to the parents of a child ... whenever the local educational agency ... proposes to initiate or change ... the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child."). The United States Court of Appeals for the District of Columbia stated a plaintiff needed to show that such changes "differed fundamentally" from the agreed-upon IEP. *Kantor v. District of Columbia,* 849 F.2d 1491, 1498 (D.C.Cir.1988); *accord W.R. v. Union Beach Brd. of Educ.,* No. 09–2268, 2009 WL 4042715, at *4 (D.N.J. Nov. 19, 2009) (unpublished) (in context of evaluating IDEA's "stay put" provision court observed that "No Change in placement occurs when a student's IEP and classes remain substantially similar."). Other courts have recognized that although a change in a component of a child's educational program may constitute a change in placement, minor changes are permissible. *See Brookline Sch. Comm. v. Golden,* 628 F.Supp. 113, 115–16 (D.Mass.1986) (holding that modification of after-school program does not constitute change in placement). In determining what changes are inappropriate, one court stated that: "The cases cited herein make clear that for a modification to qualify as a 'change in educational placement', it must affect the child's learning experience in some signifi-cant way." *Brookline,* 628 F.Supp. at 116 (listing cases).

## IV. DISCUSSION

### A. Plaintiffs' Motion

#### 1. IDEA—District's FAPE

Plaintiffs claim that the District's IEP programs failed to confer significant learning or a meaningful benefit because the District failed to address: academic needs in (i) reading and (ii) writing; (iii) emotional needs; and (iv) bullying. (ECF No. 10 at 9–22.) The District responds it provided a meaningful education and that evidence demonstrates that it did not deny him a FAPE. (ECF No. 13 at 6.) I will address each area in turn.

#### a. Academics—Reading

■ Plaintiffs argue that the District failed to meet N.M.'s reading needs. (ECF 10 at 12–16.) The H.O. found that progress monitoring reports, other reports of strong reading comprehension, teacher statements, and changes in N.M.'s readings goals provided evidence of N.M.'s reading progress. (ECF No. 1 at 47–48; *see* ECF No. 1 at 39 & 43 (making fact findings that IEPs showed N.M. achieved scores on reading within range of 75% to 100%).) Plaintiffs direct their attacks on the H.O.'s findings to his determination that the teacher testimony was credible. (ECF 10 at 15–16.) Citing what the Plaintiffs consider to be objective measures of progress, they argue that those measures show N.M. was not making progress and that such evidence should outweigh those other indicators of success (i.e., progress reports, IEP reports, teacher testimony, changes in reading goals) that the H.O. relied upon. (*See id.* at 9–15.)

Plaintiffs claim that Taylor's testimony that she prepared tests for N.M. at a sixth or seventh grade level was not credible, because there was no objective measure of

her tests. (ECF 10 at 12.) However, Plaintiffs do not meet their burden of presenting evidence that shows that Taylor was incapable of making such tests. Plaintiffs also reason that the other teachers should not have been found to be credible when they testified that N.M. made reading progress, because the H.O. failed to consider conflicting standardized testing data. (*Id.* at 12–13.) Yet, Plaintiffs do not show that those teachers were incapable of evaluating his reading progress. Additionally, Plaintiffs incorrectly attempt to shift the burden of proof to the H.O., arguing that the he had to justify his credibility findings. *Cf. Bayonne,* 602 F.3d at 556–58 (party challenging decision bears burden of proof).

Plaintiffs claim certain factors show N.M.'s lack of progress and regression. (ECF No. 10 at 12.) [12]

- They highlight that the QRI test which was administered in February of 2008, 2009 and 2010, shows that (with the exception of 2010) N.M. was consistently at the fifth grade level. (*Id.* at 9–10.) The March 2010 IEP, however, shows that on the QRI, N.M. had made improvement by achieving an "independent" classification for the sixth grade level. (P–7 at 11.)

- They note that when N.M. was at NHA he took an Informal Reading Inventory ("IRI") and scored at the fifth grade instructional level. (*Id.* at 10.) Testimony presented to the H.O. does support this assertion. (Hr'g Tr. at 962:17–963:12.)

- They argue that the H.O. found that the SRI showed a lack of progress

and regression (*id.* at 10), but the H.O. made no such finding. N.M.'s lexile score declined in November 2009 and rose in February 2010, but that score was still below what it was in March 2009. (ECF No. 1 at 39 & 45.) Yet, the SRI also indicated that N.M. was achieving 100% reading comprehension by February 2010 whereas, in March 2009, his comprehension level was at 75%. (*Id.*) Thus, N.M.'s progress was mixed. Moreover, contrary to Plaintiffs' assertion, the H.O. found that "reading comprehension, while a significant need, has generally been reported as strong." (ECF No. 1 at 47.)

- They state that N.M.'s WIAT–II scores demonstrate a lack of progress and regression (*id.* at 10–11), but the scores present mixed results. Comparing the WIAT–II scores from February 2007 and August 2010, his scores show that he declined in two categories, but he increased his score in another. (*Compare* P–1 at 8, *and* P–21 at 11.)

Collectively, these tests do not prove that N.M. failed to progress. Plaintiffs provide no authority that compels the Court to weigh certain tests more heavily than others. (*See* ECF No. 10.)

Plaintiffs attempt to diminish the importance of the progress reports. They claim that the progress report results were not derived from appropriate objective data, or that the data collected does not address the goal. (*Id.* at 14–15.)

- Plaintiffs observe that an April 21, 2008 progress report for N.M.'s reading goal regarding explicit/im-

---

12. Plaintiffs claim that the H.O. determined that "compelling evidence" exists to support this assertion regarding N.M.'s regression. (ECF No. 10 at 12.) Plaintiffs cite the passage: "The most compelling evidence point-

ing toward a denial of FAPE centers on instruction in reading." (ECF No. 1 at 47.) Read in context, this statement does not provide a basis for Plaintiffs' claim.

plicit questions (the "E/I Goal")[13] reports February 2008 test results from an exam administered before the E/I Goal was set on March 11, 2008. (ECF No. 10 at 14; *see* P–3 at 14 (showing goal on March 2008 IEP).) The March 2008 IEP, under a section entitled "Student's Present Levels of Academic Achievement,"[14] provides the identical report of N.M.'s reading level as the April 21, 2008 progress report. (*Compare* P–3 at 5; *with* P–16 at 18.) Additionally, the March 2008 IEP sets the E/I Goal and states that reports on the progress of that goal will be provided to the Parents in 9 weeks. (P–16 at 18.) Plaintiffs do not explain why identifying a February 2008 exam as N.M.'s current level of academic progress in an IEP drafted the following month constitutes the denial of a FAPE.[15] Furthermore, where the District provided a progress report on the E/I Goal prior to the time identified in the IEP for reporting on the E/I Goal, Plaintiffs again fail to show why their reliance on the most recently available benchmark was improper.

- Plaintiffs complain that a June 17, 2008 progress report on the E/I goal used a subjective evaluation reporting that N.M. "responded well" to a particular reading program. (ECF No. 10 at 14; *see* P–16 at 18 (Jun. 17, 2008 report).) Plaintiffs fail to analyze the June 17, 2008 report in its entirety. The report does present objective measures of N.M.'s reading progress, noting that N.M. scored in the advance range and proficient range on different subsets of measuring his specific skills. (P–16 at 19.)

- Plaintiffs contend that the November 2008 and January 2009 progress reports are inadequate because the District did not assess N.M. using 10 explicit and 10 implicit comprehension questions with 4 consecutive trials. (ECF No. 10 at 14.) The November 17, 2008 progress report shows that N.M. received two trials, and with respect to the January 30, 2009 report, N.M. received more than one trial. (P–16 at 19.) These trials showed that N.M. met or exceeded his comprehension goals. (*Id.*) Plaintiffs do show that the District did not measure N.M.'s progress with the quantity of trials specified in the March 2008 IEP. Yet, Plaintiffs do not demonstrate that providing two assessments instead of four under circumstances where N.M. was meeting or exceeding his goals constituted a change with N.M.'s educational placement. Because Plaintiffs fail to show that the District's deviation from the IEP effected N.M.'s learning experience or otherwise constitute a fundamental difference from the March 2008 IEP, *see Brookline*, 628 F.Supp. at 116;

---

**13.** The E/I Goal states that: "Given a 6th grade level reading passage [N.M.] will read and answer 10 explicit and 10 implicit comprehension questions with 75% accuracy over 4 consecutive trials per marking period." (P–16 at 18.)

**14.** The March 2008 IEP explains that N.M.'s academic levels this section sets forth his benchmarks and expectations. (P–3 at 5.)

**15.** Plaintiffs do not show that the statement in both the March 2008 IEP and the April progress report derived from a February 2008 exam (*see* ECF 10 at 14), but there is no evidence showing that the result did not come from a February 2008 exam.

*Kantor*, 849 F.2d at 1498; *W.R.*, 2009 WL 4042715, at *4, I find that Plaintiffs have failed to show such deviation constitutes a failure to provide a FAPE.

- Plaintiffs argue that beginning in February 2009, progress reports on N.M.'s E/I Goal assess his development using only a lexile score which decreased. (ECF No. 10 at 15.) The progress reports show that the District also measured N.M.'s progress using a derived percentile which shows he was exceeding his comprehension goals scoring in the range of 96% to 100%. (P–16 at 22.) N.M.'s lexile score did regress (*id.*), but Plaintiffs have not shown that such regression equates to a failure to progress in light of other indicia of academic success.

In sum, Plaintiffs do not demonstrate that the H.O. erred in relying upon the progress reports to evaluate N.M.'s academic progress.[16]

Thus, the H.O. did not clearly err in finding that the District provided N.M. with a FAPE with respect to reading.

### b. Academics—Writing

 Plaintiffs argue that the District failed to meet N.M.'s academic needs as they relate to writing. (ECF 10 at 16–17.) The H.O. found that baselines, goals and progress monitoring supported finding that the District provided N.M. a FAPE. (ECF No. 1 at 49.) Plaintiffs argue that objective measures demonstrate that N.M. made no progress, and these objective measures should outweigh the evidence the H.O. deemed markers of success. (*See id.*)

Plaintiffs argue that certain measurements show that N.M. failed to progress in writing, but I find such arguments to be unpersuasive:

- Plaintiffs assert that the March 2008 IEP identified writing baselines using certain measurements in the Pennsylvania Writing Rubric ("PWR") and AFMSweb, but subsequent IEPs did not provide data for those particular measurements or provided different data. (ECF No. 10 at 16.) An examination of the March 2008 IEP, however, shows that contrary to Plaintiffs' assertion, N.M.'s writing baselines were measured using the measurements in the tests "Rough Draft and Final Draft Writing Scores" and "Three Minute Writes." (P–3 at 7.) Additionally, the March 2008 IEP states that N.M.'s progress would be measured using "Writing Samples;" but, it does not identify any particular measures tied to either the PWR or AFMSweb. (*See* P–3 at 11.)

- Plaintiffs accurately state that the August 2010 WIAT–II test identified N.M. in the borderline range. (*Id.* at 16–17; P–21 at 12.)[17] However,

---

16. Furthermore, other measures of success were evident. (*See, e.g., supra* at 15–16; *see also, e.g.,* P–23 (Mar. 2010 IEP) at 5 ("Reading:B/C+-[N.M.] is an independent reader. Both [N.M.]'s fluency and comprehension have improved steadily throughout the school year"); P–10 (Mar. 2008 IEP) at 3 ("[N.M.] has shown steady growth in the area of reading. When Comparing the [QRI] scores from last year to this year, [N.M.] has shown a minimum of a years [sic] growth in the areas of wod [sic] identification, fluency, accuracy, and passage comprehension."); S–17 (Goal Progress) at 10 (report for January 30, 2009, "Given a reading prompt at the 6th grade level [N.M.] is averaging 98 words per minute with 97% accuracy.").)

17. Plaintiffs claim that every objective assessment, "whether it is the QRI, IRI, SRI or WIAT" demonstrate that N.M. failed to progress. (ECF No. 10 at 17.) Because Plaintiffs' argument is an iteration of the argument above, which relates specifically to the WIAT–

Plaintiffs do not show why the August 2010 WIAT–II should be given more importance in the H.O.'s analysis than other measure of N.M.'s progress.

- Plaintiffs note that the District classified N.M. from March of 2008 to March of 2010 as below basic in written expression. (*Id.* at 17). However, the March 2010 IEP identified N.M.'s written work as scoring a 4/6 and containing errors, but stating that, "He did an excellent job of editing and revising his work . . . ." (P–7 at 13.)

Overall, N.M. appears to have mixed results with his development, but mixed results do not equate to a lack of progress

Plaintiffs complain that the District's writing instruction was insufficient because: such instruction was provided during the same period that N.M. received instruction in reading, English and literature; and that the writing program was a "computer based" program (as opposed to a "direct instruction" program). (ECF No. 10 at 16.) Regardless, Plaintiffs do not provide a legal basis for finding that such time allocation or methodology was inappropriate.

Therefore, Plaintiffs fail to show that the H.O. clearly erred in weighing the evidence as it relates to the District's instruction in writing.

### c. Emotional Issues

Plaintiffs argue that the District failed to meet N.M.'s social, emotional, and behavioral needs. (ECF 10 at 17–21.) The H.O. concluded that FAPE had been provided with respect to these needs, because: the District was proactive in responding to such needs; witnesses credibly testified that they did not observe school-based bullying or social issues and that N.M.'s demeanor was inconsistent with bulling or social problems; and the District was not dismissive of Plaintiffs' requests related to said issues. (ECF 1 at 48–49.) In their motion, Plaintiffs attack the H.O.'s findings regarding witness credibility. (ECF 10 at 19.) Plaintiffs portray the District as non-responsive to N.M.'s emotional needs. (*Id.* at 19–20.) They argue that the data shows that N.M. was not making progress, and such data outweigh other factors indicative of success. (*See id.* at 17–21.)

The District argues that N.M. effectively functioned in school, making it difficult for the school to identify his emotional needs. (ECF No. 13 at 9.) Moreover, the District observes that the Parents noted concerns about N.M. at home. (*Id.*) The District also responds that the Parents informed the District that its programs and placements were appropriate. (*Id.*) Furthermore, the District responds that it did create programs tailored to N.M.'s needs (the March 2010 IEP and the August 2010 IEP). (*Id.*)

Plaintiffs argue that testimony from N.M.'s teachers regarding his emotional needs was not credible, because the testimony was unsupported by the record and inconsistent with their testimony elsewhere in the record. (ECF No. 10 at 19.) However, Plaintiffs present no extrinsic evidence establishing that the teachers were incapable of testifying regarding his emotional needs. (*See id.*) Plaintiffs state the special education teachers were not credible, because they taught in small classrooms. (*Id.*) Yet, Plaintiffs produce no authority for finding that the teachers could not evaluate N.M.'s well-being under those conditions. (*See id.*) Moreover, Plaintiffs do not identify any portion of the record where a particular witness contra-

---

II score, this argument suffers from the same shortcomings discussed herein.

dicted his/her own testimony. (*See id.*) Instead, Plaintiffs characterize the testimony as "inconsistent," because different teachers had made different observations about N.M.'s behavior. (*See id.*) Thus, the H.O. did not clearly err in making these credibility determinations.

Plaintiffs characterize the District as non-responsive to N.M.'s emotional needs. In Plaintiffs' view, the District identified N.M. as having emotional issues in February of 2007. (*Id.* at 18–19.) Plaintiffs argue that having identified N.M.'s emotional needs, the District was required to provide supports for those needs in the initial IEP, but the District advised the Parents to seek treatment for N.M. (*Id.* at 19.) Furthermore, Plaintiffs argue that in subsequent IEPs the District never included any emotional supports or services. (*Id.*)

In *M.C.*, the Third Circuit determined that a behavioral support was necessary because the student could not make meaningful educational progress otherwise. 81 F.3d at 394 (because student could no longer make "adequate progress" in day setting, residential program was found to be appropriate). Although the District recognized that N.M.'s emotional problems impacted his academic performance, the District did not find that such issues prevented him from making progress. (*See* P–1 at 12–14.) Regardless, in the IER the District provided recommendations to assist N.M. with surmounting his emotional problems; it sought to obtain information as to emotional development; and it planned for necessary revisions to address these needs. (*See* P–1 at 13.) Subse-

quently, the District did provide N.M. with programming to specifically address emotional needs in its March and August 2010 IEPs. (*See* P–7 at 22; P–21 at 17 & 22.)

Plaintiffs highlight that N.M. displayed emotional needs and refer to Taylor, Reed and Mallon's testimony regarding N.M.'s incidents with other students and scheduling issues. (ECF No. 10 at 19–20.) The implication is that because the District knew of these incidents and scheduling issues, the District should have been aware that N.M. required emotional supports in his IEPs. Plaintiffs appear to expect the District to reach conclusions about N.M.'s emotional and social abilities that do not logically flow from the District's employees knowledge of these incidents. Based on their testimony, the District does appear to have been engaged in trying to create an atmosphere where N.M. could learn, even if such attempts to provide him with a comfortable learning environment were not specifically spelled out in the IEPs.[18]

Plaintiffs note that Jarred Levenson ("Levenson")[19] rated N.M. as "clinically significant" on behavior rating scales. (ECF No. 10 at 20.) The Reevaluation Report states:

[N.M.]'s teachers' responses to the BASC–2 revealed varying information. Mr. Costello's (learning support teacher) ratings revealed Average scores across all composites and subscales (with the exception of Learning Problems—falling in the At–Risk range). In contrast, Mr. Levenson's (Science teacher) ratings yielded a Clinically Significant rating on the Internalizing Problems composite

---

18. Plaintiffs rhetorically ask "If there were no emotional needs or concerns, why were these 'proactive' responses necessary?" (ECF No. 10 at 20.) However, the Parents had in fact requested that N.M. be scheduled in such a manner as to avoid interactions with certain students

19. Levenson was N.M.'s special education teacher from September 2009 through March 2010. (ECF No. 10 at 20.)

and At–Risk rating on the Behavioral Symptoms Index—and Adaptive Skills composite. Teacher rating scale results suggest that as a result of Mr. Costello's smaller class size, he felt that [N.M.] did not present with behavioral difficulties in the learning support classroom. (P–21 at 13.) Again, this report does not clearly present a picture of a student who clearly had behavioral issues. Regardless, in that IEP the District provided a program to address N.M.'s emotional needs. (P–21 at 17.) Thus, the District was responsive to the indications of N.M.'s needs.

Plaintiffs argue that N.M. failed to make progress. They state that he had the same problems with learning and self-regulation in March of 2008 as he did in March of 2010. (ECF No. 10 at 17.) [20] This argument overlooks evidence of progress: "[N.M.] works well in Learning Support class in small groups and in pairs. He appears to display appropriate functional performance in all areas" (P–7 at 14); "[N.M.] is a very respectful student. He works well with others and has no problems following class rules or directions" (*id.*); and "[N.M.] is an independent worker who is capable of completing assignments on time. He works well with others and is willing to accept help when necessary" (*id.*). The evidence does not show that N.M. was clearly failing to make emotional progress, and Plaintiffs do not present a convincing argument for ignoring such evidence (*see* ECF No. 10 at 17).

Plaintiffs argue that H.O.'s conclusion, finding that the District provided a FAPE

with respect to emotional issues, is flawed, because the H.O. found facts that lead to the opposite conclusion. (*See* ECF No. 10 at 18.) According to Plaintiffs, the H.O. found clear and credible evidence that the District denied N.M. a FAPE, (ECF No. 10 at 18 (citing ECF No. 1 at 48–49)), but Plaintiffs mischaracterize the decision. The H.O. found that evidence existed in both parties' favor. (*See supra* at Sec. II.B.6.)

Thus, the H.O. did not clearly err in finding that the District provided N.M. with a FAPE.[21]

#### d. Bullying

Plaintiffs claim that the H.O. erred in finding that the District did not deny a FAPE with respect to N.M.'s social needs (i.e., bullying). (ECF No. 10 at 24.) The H.O.'s conclusion in this regard was made in evaluating N.M.'s emotional and social issues together. (*See* ECF No. 1 at 48–49.) Thus, the H.O.'s reasoning is the same as the reasoning set forth the preceding section (*see supra* Sec. III.A.1.iii.) Plaintiffs raise three issues with the H.O.'s conclusion that the District was proactive. (ECF No. 10 at 24.)

First, they challenge his reasoning under the assumption that the H.O. is equating the District's proactive response to the discipline meted out to the students involved in each incident. (ECF No. 10 at 24.) Such assumption is inaccurate. This reference relates to the finding of fact that: "Before the [8th grade] school year, the parent also spoke with a building ad-

---

**20.** In support of this argument Plaintiff cite various IEPs and a Goal Progress report. (ECF No. 10 at 17 (citing P–3 (Feb. 2008 IEP), P–4 (March 2008 IEP), P–5 (Feb. 2009 IEP), P–7 (March 2010 IEP), P–21 (Nov. 2008 Goal Progress)).)

**21.** The District argued that Plaintiffs' argument fails because, the Parents identified con-

cerns with N.M.'s emotional needs at home and the Parents had agreed to various programs (Notices of Recommended Educational Placement). (ECF No. 13 at 9–10.) I do not reach these arguments, because the District's other arguments sufficiently rebut Plaintiffs' position.

ministrator about bullying concerns, and the administrator collaborated with the student's teachers about observation and being proactive if they noticed any bulling . . . ." (ECF No. 1 at 41.) Second, Plaintiffs argue that the District's discipline was not consistent with the District's own policy and student code of conduct (*id.*), but they fail to provide that information or show that such disciplinary inconsistency equates to a denial of a FAPE (*see* ECF No. 10 at 20–21).

Third, in Plaintiffs' view, the District's discipline did not provide a remedy, as "the bullying continued through the 2008–2009 and 2009–2010 school years . . . ." (*Id.*) Yet, Plaintiffs do not show that the District failed to respond to an incident after Plaintiffs brought the issue to the District's attention, or that the District was otherwise dismissive of Plaintiffs' requests. (*See* ECF No. 10 at 23–24.)[22] Additionally, Plaintiffs do not show that the District, after having exhausted its discipline of a particular student, was ineffective. (*See id.*)

The District took steps to eliminate a culture of harassment. Although the District could have implemented additional measures, it was not indifferent to harassment, and the District appeared willing to take further actions. For insight on the types of steps a school district could take, I turn to guidance provided by the United States Department of Education, Office of Civil Rights (the "DOE"). The DOE stated that a school must address harassment that it knows or reasonably should know about, and in responding it must take immediate and appropriate action to investigate what occurred:

If an investigation reveals that discriminatory harassment has occurred, a school must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring . . . .

Appropriate steps to end harassment may include separating the accused harasser and the target, providing counseling or the target and/or harasser, or taking disciplinary action against the harasser. These steps should not penalize the student who was harassed . . . .

In addition, depending on the extent of the harassment, the school may need to provide training or other interventions not only for the perpetrators, but also for the larger school community, to ensure that all students, their families, and school staff can recognize harassment if it recurs and know how to respond. A school also may be required to provide additional services to the student who was harassed in order to address the effects of the harassment . . . . An effective response also may need to include the issuance of new polices against harassment and new procedures by which students, parents, and employees may report allegations of harassment (or wide dissemination of existing policies and procedures), as well as wide distribution of the contact information for the district's . . . coordinators.

. . . At a minimum, the school's responsibilities include making sure that the harassed students and their families know how to report any subsequent problems, conducting follow-up inquiries to see if there have been any new incidents or

---

22. In this same vein, as stated above, N.M.'s mother chose to handle at least one incident on her own, as opposed to allowing the school to intervene. (Hr'g Tr. at 645:4–646:2 (N.M.'s mother declined Mallon's offer of assistance and informed Mallon that the other student "was a neighborhood friend and [N.M.'s mother] wanted to deal with that herself . . . .").)

any instances of retaliation, and responding promptly and appropriately to address continuing or new problems.

Letter from Department of Education to "Colleague," at 1 (Oct. 26, 2010) (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague 201010.pdf) (the "Letter") (*cited with approval in T.K. v. New York City Dept. of Educ.*, 779 F.Supp.2d 289, 316 (E.D.N.Y.2011)). The DOE's Letter provides additional actions or steps that the District could have taken. (*See id.*) Yet, the Letter also identifies steps that the District undertook in responding to harassment. Based on the H.O.'s finding of facts, it appears that District remained open to progressively implementing additional procedures to address N.M.'s needs.

Plaintiffs argue the District failed to provide a FAPE in that the District did not "convene the IEP to discuss adding any social, emotional, or behavioral supports whatsoever to N.M.'s programs or placement in effort to address the bullying and harassment and N.M.'s other emotional needs." (ECF No. 10 at 25.) As stated above, the District did attempt to assist N.M. with his social problems and the District's March and August 2010 IEPs did provide emotional supports to N.M. (*See supra* at Sec. III.A.1.iii.)

Thus, the H.O. did not clearly err in finding that the District did not fail to provide a FAPE.

### e. Conclusion

As discussed above, Plaintiffs are unable to demonstrate that the H.O. erred in concluding that the District offered N.M. a FAPE. Plaintiffs fail to show that the H.O. was clearly erroneous in finding that the District appropriately addressed N.M.'s academic, social and emotional needs. Accordingly, I find that Plaintiffs IDEA denial of FAPE claim lacks merit.

### 2. IDEA—Tuition Reimbursement

■ Plaintiffs argue that the District should reimburse them for the tuition paid to NHA for N.M.'s education. (See ECF No. 10 at 23.) The Third Circuit has explained that:

A court may grant the family tuition reimbursement only if it finds that the school district failed to provide a FAPE and that the alternative private placement was appropriate. *See Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16, 114 S.Ct. 361, 126 L.Ed.2d 284[ ] (1993); *Mary T. [v. Sch. Dist. of Phila.]*, 575 F.3d [235,] 242 [ (3d Cir. 2009) ]. Courts also have broad discretion to consider equitable factors when awarding tuition reimbursement. *Florence Cnty. Sch. Dist.*, 510 U.S. at 15–16, 114 S.Ct. 361 . . . .

*Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 426 (3d Cir.2013). As discussed above, I conclude that the District did not deny a FAPE to N.M. (*See supra* at Sec. III.A.1.v.) As a result, Plaintiffs were not entitled to tuition reimbursement for NHA tuition. Having reached this conclusion, there is no reason to examine the appropriateness of the placement at NHA or whether equitable considerations bar reimbursement. *See Munir*, 723 F.3d at 426.

Accordingly, I recommend that Plaintiffs' IDEA tuition reimbursement claim be denied.

### 3. Section 504 and the ADA

Plaintiffs argue that: "the District denied N.M. the FAPE he was entitled to under the IDEA by failing to appropriately address his academic and social and emotional needs. In so doing the District discriminated against N.M. in violation of Section 504 and the ADA." (ECF No. 10 at 35–36.) Plaintiffs do not assert any other basis for relief under Section 504 or the ADA. (*See id.*) Because I have found that the District did not deny N.M. a FAPE

(*see supra* at Sec. III.A.1.v), Plaintiffs' alleged violations of Section 504 and the ADA have no basis. Therefore, I recommend that Plaintiffs' Section 504 and ADA claims be denied.

### 4. Conclusion

Having found that Plaintiffs' claims under the IDEA, Section 504 and the ADA lack merit, I respectfully recommend that the Court deny Plaintiffs' motion (ECF No. 10).

### B. District's Motion

The District moves the Court to affirm the H.O.'s decision and enter judgment for the District. (ECF No. 11 at 5.) The District argues that it "provided [N.M.] with FAPE during [N.M.]'s sixth seventh and eighth grade school years." (*Id.* at 10.) The District's argument is based entirely on this premise. As stated above, the *Bayonne* Court explained that "the party seeking relief bears the burden of proof." 602 F.3d at 557. Thus, in challenging the H.O.'s decision, Plaintiffs, who sought relief from that decision, bore the burden of proving that the H.O. erred in finding the existence of a FAPE. Having found that Plaintiffs failed to satisfy that burden (*see supra* at Sec. III.A.1.v), I find that the District's motion, which merely seeks affirmation of the H.O.'s decision and judgment in the District's favor, is meritorious.

Therefore, I respectfully recommend that the Court grant the District's motion (ECF No. 11).

### V. CONCLUSION

For the reasons set forth above, I conclude as follows:

(1) Plaintiffs' motion for judgment on the administrative record (ECF No. 10) fails to present a persuasive argument for reversing the hearing officer's decision which found that the District offered N.M. a FAPE; and

(2) Plaintiffs fail to meet their burden of proving that the District failed to provide N.M. with a FAPE and that the H.O. erred in reaching his decision. Thus, the H.O.'s decision should be affirmed. Accordingly, the District's motion for judgment on the administrative record (ECF No. 11) is meritorious.

Therefore, I make the following:

### RECOMMENDATION

AND NOW, this 19th day of December, 2013, I **RESPECTFULLY RECOMMEND** that the Court **DENY** Plaintiffs' motion for judgment on the administrative record (ECF No. 10) and **GRANT** the District's motion for judgment on the administrative record (ECF No. 11).